## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FENYANG STEWART,**<br>6040 Richmond Hwy Apt 707<br>Alexandria, VA, 22303<br>757-506-4579<br><br>**PLAINTIFF**<br><br>v.<br><br>**GINA M. RAIMONDO,**<br>in her official capacity<br>Secretary of the United States<br>Department of Commerce,<br>1401 Constitution Avenue, N.W.<br>Washington, DC 20230;<br><br>and<br><br>**ROBERT FENNEMA,**<br>in his individual capacity<br>5110 Kings Grove CT<br>Burke, VA 22015<br><br>**DEFENDANTS.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:23-cv-00149 JURY DEMAND<br>Assigned To : Walton, Reggie B.<br>Assign. Date : 1/19/2023<br>Description: Employ. Discrim. (H-DECK)<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

(Disability Discrimination, Retaliation, Racial Discrimination, Violation of the Fifth and Thirteenth

Amendments of the United States Constitution)

1.      Plaintiff Fenyang Stewart, proceeding *pro se*, brings this action against Defendant Gina

M. Raimondo, Secretary of the United States Department of Commerce, to recover

compensatory damages, back pay, instatement, front pay, and reasonable attorney's fees and

costs, if applicable, for discrimination and retaliation under the Rehabilitation Act of 1973

(Rehabilitation Act), 29 U.S.C. §791, et seq., including violated 29 C.F.R. § 1630.10(a), and

RECEIVED

JAN 19 2023

Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia

Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000e–16, et seq, and the Thirteenth Amendment of the United States Constitution.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Fenyang Stewart is a resident of Alexandria, Virginia.

3.      Defendant Gina M. Raimondo is the Secretary of the United States Department of Commerce (Commerce), an agency of the federal government, whose principal office is located in Washington, D.C., and of which the U.S. Patent & Trademark Office is a sub-agency or otherwise component.

4.      Defendant Robert Fennema is a Supervisory Patent Examiner working for the U.S. Patent and Trademark Office and upon information and belief, is a resident of Burke, VA.

5.      On November 29, 1999, the Patent and Trademark Office Efficiency Act (PTOEA) was signed into law, which established the United States Patent & Trademark Office (PTO) as an agency of the United States, within the Department of Commerce.

6.      Plaintiff exhausted all administrative remedies by filing a timely informal and formal complaint, along with a subsequent request for an EEO hearing on these matters. An EEOC administrative judge was assigned to the matter on or around August 2022.

7.      Plaintiff, still aggrieved, having spent more than 180 days after filing his formal complaint with no hearing date scheduled by the administrative judge therein, and thus unsatisfied with the underlying administrative process, filed the instant complaint in the Federal District Court for the District of Columbia on Thursday, January 19, 2021, on or around 9:00 am.

8.    The PTO Under Secretary is appointed by the President, by and with the advice and consent of the Senate and reports to the Secretary of Commerce (the Secretary) with respect to policy matters. 35 U.S.C. § 1.

9.    Statute 28 U.S.C. § 1391 states: In general - A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides. *Mitchell v. Baldrige*, 662 F. Supp. 907, 908 (D.D.C. 1987).

10.    For purposes of 28 U.S.C. § 139l(e)(l), the residence of federal officers is that place where the officers perform their official duties. S*ee Reuben H. Donnelley Corp. v. F.T.C.*, 580 F.2d 264, 266  (7th Cir. 1978).

11.    The USPTO is subject to the policy direction of the Secretary of Commerce. 35 U.S.C. § 1.

12.     Plaintiff alleges that USPTO failed to follow the policy direction of the Secretary of Commerce, specifically, Commerce's Human Resources Bulletin (HR Bulletin) #207, FY16, issued on April 8, 2016, when it failed to select him for a Patent Examiner Position, On or around May 11, 2021, Plaintiff was not selected for the position of GS-9 Patent Examiner, advertised as Vacancy Announcement No. CP-2021-0003.

13.    HR Bulletin #207 states in part:

> This HR Bulletin provides Department of Commerce-wide guidance on administrative leave used either before or after proposing performance-based or conduct-based adverse actions under Title 5, Code of Federal Regulations (CFR), Part 752, in order to provide a structured approval process and broader consistent accountability throughout the Department of Commerce (Department). This bulletin provides clarity, broader accountability, and structure to the approval process... This bulletin pertains to all Federal employees in the Department except for those in the Office of the Inspector General...

The use of administrative leave related to unacceptable performance and misconduct should be limited to situations involving brief absences. Supervisors/managers cannot grant administrative leave under any circumstance for unacceptable performance and misconduct without consulting with an Employee Relations (ER) Specialist in their servicing human resources office (SHRO) and their bureau/operating unit Chief Financial Officer (CFO) or designee. If a servicing ER Specialist cannot be contacted during an emergency, managers may directly contact the Office of General Counsel…

Prior to granting administrative leave (including extensions of existing administrative leave), the following options must be considered regardless of the length of time for which the period of administrative leave is contemplated:

• A detail to another office/supervisor
• To remain in the same office and report to a different supervisor
• Telework
• An indefinite suspension and enforced leave…

In rare circumstances, administrative leave may be used for an employee while suspension or removal adverse actions procedures have been proposed. In this situation, administrative leave should only be used for the time necessary to effect the adverse action, and when a determination that the employee's continued presence on the job during the notice period may:
(1) pose a threat to the employee or others;
(2) result in loss or damage to Government property; or
(3) jeopardize legitimate Government interests
(Title 5, CFR § 752.404(b )(3)(iv)).

The following options must be considered before granting administrative leave in this situation:

• Assign the employee to duties where he or she is no longer a threat to safety, to the agency/bureau/operating unit mission, or to Government property;
• Allow the employee to take leave;
• Place the employee on enforced leave (i.e., required to absent him or herself from duty)

in specific situations as designated in Department Administrative Order 202-752, "Discipline." The supervisor/manager and ER Specialist must discuss this with the OGC/ELLD before taking this action to ensure specific regulatory requirements have been met.

14.    Plaintiff formerly worked at USPTO starting in September 9, 2013 as a GS-9 Patent Examiner, up to his removal from his position as a GS-11 Patent Examiner on September 19, 2016.

15.    USPTO has a "Ban and Bar" policy whereby its Director David Wiley unilaterally, without consultation with Commerce's Office of General Counsel, placed Plaintiff on paid administrative leave on or around March 24, 2016, and banned him from the USPTO premises (colloquially called "being placed on the Ban & Bar list") based on knowingly false, statements made by his Supervisor at the time, Kenneth Lo, wherein Wiley determined that Plaintiff may be a possible threat to others.

16.    On or around March 24, 2016, Wiley only consulted with Darrel Disque, an Investigator with Commerce at the time, prior to placing Plaintiff on paid administrative leave, who recommended that Stewart was not a threat to himself or others and allowed him to return to work before being overruled by Wiley and directed to by Wiley to immediately place Plaintiff on the Ban & Bar list and on paid administrative leave.

17.    On or around May 9, 2016, Plaintiff was issued a Notice of Proposed removal in relation to those false statements made by Lo, along with other discriminatory and retaliatory specifications.

18.    On September 29, 2016, after Plaintiff responded to the Notice of Proposed Removal orally and in writing, he was issued a Notice of Removal.

19.    On or around February 11, 2021, Plaintiff submitted an application for employment with the USPTO for a GS-9 Patent Examiner Position.

20.    In the February 11, 2021  job application, Plaintiff requested consideration under the Schedule A hiring authority for individuals with disabilities and included a letter from his

rehabilitation counselor certifying Plaintiff was a qualified individual with a severe psychiatric disability who could succeed in jobs like the Patent Examiner position if hired.

21.    As a result of Commerce's failure to properly review USPTO's hiring policy under Schedule A and direct USPTO to implement its Schedule A hiring policy in a non-discriminatory manner, Plaintiff was not given any consideration in regards to his request to be hired under a Schedule A hiring authority for Vacancy announcement No. CP-2021-0003. As such, Stewart was forced to compete with other non-disabled employees and was not given any priority consideration as required under the Rehabilitation Act.

22.    Still, Plaintiff was found to be a most qualified applicant even under the Competitive Examination procedures and was selected for an interview for the position in question.

23.    On or around April 2021, Plaintiff interviewed with Patent Examiner Dameon Levi and scored a total of 4.5/5.0 points on the interview.

24.    Plaintiff's Federal civilian employee experience as a paralegal and EEO counselor, from on or around June 2018 until the the time of his application was denied, and his law school background and prior experience as a Fully Successful GS-9 Patent Examiner, in combination with his 4.5 interview score made him the most qualified applicant for the position in comparison to all other applicants on every Certificate of Eligibles he was placed on.

25.    Although Plaintiff was the most qualified applicant for the position, Hiring Manager Keisha Bryant, after implementing a "Rehire Analysis" policy, allowed for discriminatory and retaliatory false allegations made by Plaintiff's former supervisor, Robert Fennema, that insinuated that Plaintiff was violent and thereby Fennema refused to work in the same complex as Plaintiff, to cause her to decide not to select Plaintiff for the position in question.

26.    Keisha Bryant also failed to select Plaintiff for the position because the rehire analysis Plaintiff was still on the Ban & Bar list at the time of his application as a result of Commerce's failure to review USPTO's existing Ban and Bar List policy, Workplace violence policy, and , as the reason not to hire Plaintiff for the position.

27.    By failing to timely review and modify or eliminate the USPTO's "Ban and Bar policy" and its "Rehire Analysis Policy", Commerce unlawfully discriminated and retaliated against Plaintiff on the basis of disability and race when he was not selected to be a Patent Examiner working at USPTO in Alexandria, VA, on or around May 2021 and during every subsequent hiring iteration for the same Vacancy announcement, which was completed on or around October 2021.

28.    Since the USPTO Ban & Bar policy and Rehire Analysis Policy was by regulation and statute required to be under the review and direction of Commerce, jurisdiction is proper since this complaint directly implicates Commerce as the entity who discriminated against Complainant by allowing the USPTO's policy harm Plaintiff's rights under the Rehabilitation Act, Title VII,

29.    Robert Fennema is joined as a party in his individual capacity who, while acting under color of Federal Law, violated Plaintiff's Constitutional Right of Due Process under the 5th Amendment and his Property right of continued Federal employment, by failing to provide an opportunity to respond to Fennema's statements and by making statements he knew or should have known were false, communicated these statements to Keisha Bryant who under the cat's paw theory failed to select Plaintiff for the position based on Fennema's hidden retaliatory and discriminatory animus as manifested through his false statements. Also, the Agency violated

Plaintiff's due process rights by not informing him of the process, if any exists, to remove his name from the ban & bar list.

30.    Robert Fennema is joined as a party in his individual capacity who, while acting under color of Federal Law,  violated Plaintiff's Constitutional Right of immunity from the badges and incident of slavery, specifically racial stereotyping of Black men as brutes and violent animals with no self-control, and defamation of Plaintiff's character based on the same statements.

31.    Plaintiff is a Black natural-born United States Citizen whose descendants were enslaved.

32.    Robert Fennema, by submitting to the hiring manager Keisha Bryant false statements that stereotyped Plaintiff as violent individual and which he knew or should have known were false, since those statements were found by the preponderance of evidence to not have occurred by Merit Systems Protection Board (MSPB)  administrative judge Andrew Dunnaville, subjected plaintiff to badges of slavery, the rehire analysis sheet and the Ban & Bar list (a racial Scarlet Letter meant to exclude Black Patent Examiners from employment by making false accusations of workplace violence), and an incident of slavery, racial defamation based on knowingly false depictions of Plaintiff as being violent, in alignment with historical racist tropes of former enslaved individuals which were used to justify their lynching, murder, maiming, along rape of their wives and destruction of their families and property, of which Plaintiff is immune from under the Thirteenth Amendment.

33.    No special factors or circumstances exist calling for hesitation in creating a new *Bivens* remedy for racial defamation by Federal employees that result in a withholding of the property right of continued Federal employment by former federal employees and/or which violates the Thirteenth amendment.  This is because no other remedy exists that reaches individual federal employees, who acting under color of law, violate the immunity of current or former Federal

employees whose ancestors were chattel slaves. Section 1981 claims cannot be brought against Federal employees, only state officials acting under color of law.

34.     Likewise, Title VII and the Rehabilitation Act only can provide injunctive relief and compensatory damages up to 300,000 dollars from the Agency and may result in disciplinary action for the manager found to have discriminated.

35.     Robert Fennema subjected Plaintiff to one or more badges or incidents of slavery by transmitting knowingly false stereotypes, rumors, and otherwise false statements to decision maker Keisha Bryant who, under the cat's paw theory of retaliation, knowingly or unknowingly acted with the transferred discriminatory and retaliatory animus harbored by Fennema when she failed to select him, dehumanizing him in the process and causing him to suffer great emotional, psychological, and financial harm.

36.     PTO failed to receive the Commerce's policy review and direction before USPTO implemented its rehire analysis policy.

37.     PTO failed to  receive the Commerce's policy review and direction before USPTO implemented its "ban and bar" policy.

38.      PTO Failed to receive Commerce's policy review and direction before USPTO implemented its workplace violence policy; Failed to receive the Secretary's policy review and direction before USPTO implemented its anti-harassment policy; used their authority to unilaterally exclude patent examiners  from the workplace by deeming them a possible threat to themselves or others without meeting the required conditions in the exercise of that delegated authority as the Secretary or Under Secretary proscribed, including first making a finding whether the alleged threat the employee posed could be reduced or eliminated by reasonable accommodation.  The USPTO Failed to comply with the Secretary of Commerce's reporting

requirements, by failing to provide the Secretary with full access to USPTO data, information, resulting from its rehire analysis policy and its ban and bar policies and procedures on a regular and recurring basis to ensure USPTO conformance with Secretarial policy direction.

39.     The USPTO failed to seek and and receive the approval following timely notice by the USPTO to the Department of Commerce Office of General Counsel (DOC/OGC) of all its rehire analysis policy and its ban and bar policies or to implicate policy matters; USPTO failed to conduct its anti-harassment investigations, ban and bar decision making, and its rehire analysis policy in accordance in a manner that those policies would be subject to the oversight responsibilities of the Inspector General as set forth in the Inspector General Act of 1978, as amended (5 U.S.C. App. 3).

40.     USPTO failed to frequently provide comments to the Secretary of Commerce on its human resources policies and issues including its rehire analysis policy and its ban and bar policies and procedures, and pending cases raising those same significant legal issues. USPTO failed to share accurate information related to the hiring of disabled persons. USPTO Failed to follow Departmental Administrative Order (DAO) as provided for in DOO 10-14, Section 5.

41.     The Rehabilitation Act, 29 U.S.C. §794a(a)(1), provides this Court with personal jurisdiction over Commerce because the omissions and lack of oversight and direction of USPTO Plaintiff alleges as discriminatory and retaliatory occurred at Commerce's Washington, D.C. Headquarters.

42.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331.

43.     Venue is proper in this Court pursuant to 28 U.S.C. §1391.

44.    Plaintiff properly exhausted her administrative remedies pursuant to 29 C.F.R. §1614.407(c).   Formal Complaint EEOC No. 570-2022-00815X  (Agency No. 21-56-43) was originally filed with the Agency on Oct 24, 2021.

45.    For the foregoing reasons, jurisdiction is proper.

### Count I

### (Non-Selection on the basis of Disability - Violation of the Rehabilitation Act)

46.    The previous paragraphs are copied as if set forth herein.

47.    The following is adapted from an EEOC article on Schedule A hiring:

The Schedule A hiring authority for individuals with disabilities streamlines the often complex federal hiring process. Schedule A regulations (5 CFR § 213.3102(u)) specify that a person must have an intellectual disability, a severe physical disability or a psychiatric disability to be appointed using this hiring authority. In order to be eligible for employment through the Schedule A non-competitive process, documentation of the disability is required. Agencies can hire qualified individuals with disabilities without posting a job announcement or going through the certificate process. While the HR professional will typically make an initial determination as to which candidates are qualified for the position the Selecting Official (SO) wishes to fill, once the SO receives the list of Schedule A eligible candidates, the SO should review each application to ensure the candidate is qualified for the job. If the  (SO) is not satisfied with any of the Schedule A applicants presented to the SO, the SO retains the option of using the traditional competitive process to fill the vacancy. Once the SO has identified the top three to five candidates the SO should start conducting interviews, if desired (interviews are optional). Once a selection decision is made, the SO should notify the appropriate HR Professional. He or she will then extend an offer of employment on behalf of the agency. Once the offer has been accepted, a start date will be established to bring the candidate on board. Finally, probationary periods for Schedule A employees typically last up to two years. Schedule A candidates should be held to the same performance standards as all other employees. Managers are strongly encouraged to track the date the employee is eligible for conversion into the competitive service. If the employee successfully completes the probationary period, the Supervisor should let HR know that the employee should be converted to the competitive service.[1]

---

[1] EEOC. The ABCs of Schedule A Tips for Hiring Managers on using the Schedule A Appointing Authority. 3/19/22.  url: https://www.eeoc.gov/publications/abcs-schedule-tips-hiring-managers-using-schedule-appointing-authority#_Toc42508500 5

48.    According to the South Dakota Dept. of Human Resources, an overview of the Schedule A hiring process combined with the process for hiring Veterans with preference eligibility is as follows:

> When we set the job announcement up, we set up an assessment, which is the online questionnaire. And that has point values for certain questions. And when an Applicant applies and answers those questions, they are going to get a score. [A score of] 70 is considered qualified. If not, the system is automatically going to kick them out, saying they're not qualified. Or, there may be specific questions such as education. If you must have education and it's required, and they check "no" (I don't have education) that is also going to make them ineligible because that position requires education. Once they get a score, then, when we pull up applications, we're going to review the scores. We have best qualified, qualified, and well qualified. We start at the best qualified. Those [the applicants rated best qualified] are referred to the Selecting Official. In certain instances, Veteran's preference plays into that because veterans are placed on the top of the list. A disabled person is on a separate list. **So, if they [the disabled applicants applying under Schedule A] are found qualified they are refer**red on to the Selecting Official also without having to compete... On the notice that they get, we will say, if there is a veteran, it will say, that person was qualified, but due to Veteran's preference, they weren't referred to the Selecting Official. They may be [selected] if the Veteran would say they already got a position, could not come, then we could fill that position with someone lower on the scale... Under [the] Merit Promotion [category rating system], usually if there is a veteran, they have to hire that veteran first unless we get OPM permission to not hire that veteran and hire someone else.  Under Merit Promotion, the top 10 [of the Best Qualified applicants] go to the Selecting Official.[2]

49.    The above excerpts make it clear that Schedule A hiring authority has two paths. For one path, HR refers a group of qualified Schedule A applicants who applied via USAJobs, based on their resumes and self-assessments, to the Selecting Official for exclusive consideration. If the SO  makes a selection from that group (if no Veterans with Preference Eligibility had applied), the applicant would be sent a tentative job offer. This means that the

---

[2]South Dakota Dept. of Human Resources. *Schedule A Federal Gov't Hiring Initiative*. YouTube, (21:54-25:05). 2016 url:  https://youtu.be/w7YMDQJ4LbI

Schedule A applicants compete in a pool with each other but do not have to compete with the rest of the applicants on the Cert who do not have preference. If none of the Schedule A applicants are selected, those applicants will be reconsidered along with the rest of the Certificate of Eligibles and will compete with them without regard to Schedule A. The second path is when an applicant submits his resume directly to the hiring manager and requests to be hired directly under Schedule A for any open positions or for a particular position being advertised on USAJobs.gov. If no jobs are available, that resume will be held for a year and considered if and when a new position becomes available. If a new position becomes available, the individual could be hired directly without competition under the Schedule A hiring authority.

50.    Plaintiff Competed for the Position in Question with all other Applicants and was not given Priority Consideration.

51.    When Stewart applied for the Patent Examiner job, Vacancy Announcement No. CP-2021-0003, the position was open to individuals with disabilities. In his application Stewart submitted proof of his disability and requested to be considered under the Schedule A hiring authority by submitting a Schedule A Letter as mandated.

52.    At all times relevant, Plaintiff was a qualified employee with a disability who could perform the job with a reasonable accommodation of remote work or full-time telework.

53.    Remote work or full-time telework is a reasonable accommodation that could reduce or eliminate any alleged threat that Plaintiff opposed to others during all times relevant.

54.    le A letter from his licensed social worker.

55.    Stewart was found tentatively eligible for the position and  referred to the Hiring Manager.

56.    As a result of Commerce's failure to provide direction and oversight, USPTO's unregulated discriminatory policy led to Plaintiff's non-selection.

## Count II
### (Racial Stereotyping and Racial Defamation Thirteenth Amendment Violation Sec. 1983)

57.    The previous paragraphs are copied as if set forth herein.

58.    Robert Fennema, acting in his individual capacity under color of Federal Law, communicated to the rehire analysis historical racial stereotypes of Black as Brute and Beast that depicted Plaintiff in a false defamatory and discriminatory light.

59.    Fennema informed Keisha Bryant, the Selecting Official, words to the effect Plaintiff should not be selected because he is violent and may be a threat to others and that Fennema would not work in the same complex as Plaintiff because Fennema is scared if Plaintiff gets access to the building, he would harm Fennema.

60.    When Fennema was asked on the Rehire Analysis Form, "Was this employee involved in any misconduct which did not result in a formal disciplinary action? If so, please describe, " he responded, "[Fenyang Stewart] was placed on the USPTO bar and bar list and admin leave, after he brought a security officer to a SPE's Office, since [Fenyang Stewart] was feeling concerned [Fenyang Stewart] would harm the SPE". Here, Fennema put FE in the brackets to indicate "Former Examiner"; that phrase was changed in the instant complaint to 'Fenyang Stewart' for further clarification.

61.    In the Complaint No. DC-0752-17-0094-I-1, July 7, 2017 MSPB Final Decision on Plaintiff's Appeal of the removal decision, the Board stated in part on page 10:

> 7. Specification 7 – NOT SUSTAINED
>
> Charge 7 states, "[o]n Monday, March 7, 2016, you engaged in disruptive

behavior during a meeting with your supervisor when you stated that the security officer was there to protect you and suggested through your words and body language that you were having a difficult time controlling yourself."

In his notes, Mr. Lo stated that the appellant appeared to be distressed, shaking, and angry during the March 7, 2016 meeting. AF, Tab 13 at 8. However, I find that the specification cannot be sustained. The appellant stated that he was not shaking, and was not angry, during the meeting, and did not display abrasive language. Id. In addition, Security Officer Angela Green, who witnessed the meeting, stated that she observed the appellant's body language to be nonthreatening. AF, Tab 13 at 16.

Based on the appellant's statement and statement of Ms. Green, I find that the agency has failed to prove the specification by a preponderance of the evidence. Accordingly, the specification is not sustained.

62.     As shown above, Fennema's mischaracterization of the facts is egregious, wherein he states that Plaintiff stated that Plaintiff was concerned that Plaintiff would harm the SPE [the Supervisory Patent Examiner Kenneth Lo]; wherein the actual specification states, "[Plaintiff] stated that the security officer was there to protect [Plaintiff]". To be clear, this specification was not sustained on appeal and therefore, Lo's characterization of the incident was not believed by a third party adjudicator based on all of the evidence before him. Fennema was not present during the incident and Fennema's statements are completely false and misleading, designed to make the selecting official assume that Plaintiff was going to attack Lo, despite the security guard stating in her notes that Plaintiff's body language was nonthreatening. Also, Plaintiff wasn't placed on admin leave and the ban and bar list immediately after this incident but rather nearly a month later on March 24, 2016.  This type of racial stereotyping and falsification of evidence is dangerous and is a vestige of slavery that can only be eliminated by holding Fennema financially accountable for compensatory and punitive damages for making

such willful and wanton racially defamatory statements that he knew or should have known were false.

63.    Fennema knew or should have known the statements he transmitted via the rehire analysis form were in fact false, unreliable, and unverifiable by Fennema himself since Fennema was not there himself to witness the incidents he described on the rehire analysis form.

64.    On the rehire analysis form,  after being asked "Did this employee experience any performance problems that did not result in a rating below Fully Successful, or oral/written warning? If so, please describe," Fennema stated, "Yes. He took massive leave and admin leave in the last 8-9 months before his removal."

65.    The massive leave and admin leaved in the last 8-9 months prior to Plaintiff's removal was not evidence of performance problems by Plaintiff, but rather USPTO's failure to heed to Commerce's Policy Direction via Commerce's Human Resources Bulletin (HR Bulletin) #207, FY16. HR Bulletin #207 was issued on April 8, 2016, while Plaintiff was on admin leave, requiring admin leave more than 30 days long for disciplinary issues to not be extended for more than 30 days without permission from Commerce Office of General Counsel:

> During the initial 30-day period, the supervisor/manager-in collaboration with the ER Specialist-must explore/consider other options for the employee in case the situation is not resolved within the 30-day period.

> If administrative leave is still needed after the initial 30-day period, the supervisor, in consultation with the ER Specialist and the OGC/ELLD, needs to provide written documentation to their bureau/operating unit CFO or designee as to why the 30-day initial administrative leave period was exceeded as well as alternate options that were explored/considered, and the results thereof. This documentation must be maintained in the ER case file and provided to the OGC/ELLD.

66.    But for the Agency's failure to consider other options, for example telework or a transfer to a prior supervisor as a reasonable accommodation, Plaintiff would not have been forced to remain on leave for nearly 7 months. Indeed, the only "massive leave" Plaintiff took was the paid administrative leave that he was placed on due to the false allegations made by SPE Lo.

67.    On the rehire analysis form, when asked, "Are there any other relevant reasons for or against re-hiring this employee? If so, please describe," Fennema replied, "Will not work in same complex as [Fenyang Stewart]. Fearful for self and everyone's safety due to FE's disruptive behavior."

68.    On December 2, 2015, when asked if Plaintiff's conduct was unsatisfactory, Robert Fennema responded "no" and signed his name at the bottom of the page.

69.    Stewart's only other in-person interaction with Fennema was in January 2016, when Fennema issued Stewart the Safety Zone notice. Fennema never alerted security to his concerns or fear of Plaintiff and notes exist in the record of him doing so .

70.    Not only that, Specification 13 was not sustained in the final MSPB Decision:

13. Specification 13 – NOT SUSTAINED

Specification 13 is based on the March 24, 2016 meeting discussed above. The specification alleges that during the meeting, the appellant engaged in inappropriate behavior when he angrily gripped his papers, breathed heavily, snorted, and lunged forward out of his chair. The agency submitted Mr. Lo's signed statement to support the specification. AF, Tab 13 at 10 – 11.

In response to the specification, the appellant answered "no" when asked at his June 15, 2016 polygraph if he lunged at Mr. Lo in his office. AF, Tab 11 at 56. The polygraph examiner found "No Deception Indicated" when asked the question. Id. The appellant also stated that he did not act against Mr. Lo in an aggressive manner. Id. at 55. In addition, the appellant submitted an affidavit in which he denied lunging at his

supervisor or acting angrily or loudly during the meeting. Id. at 32 – 36.

I find that the weight of the evidence submitted by the appellant outweighs that of the agency. Accordingly, Specification 13 is not sustained.

71.    Further, since Fennema was not present in any of these alleged incidents, it is highly unlikely that a reasonable selecting official, without obtaining more evidence, would find that these bald assertions substantiated, much less credible. Fennema's views on all of these matters are exempted from consideration   in this new action due to issue preclusion, since these particular issues were already decided by the Board in Plaintiff's favor.

72.    However, under the cat's paw theory, objectively, a selecting official could be convinced by the barrage of lies strewn about by Fennema, in hope that one sticks, not to hire Plaintiff as a Patent Examiner, via Fennema wily transferring his retaliatory intent to her.

73.    Plaintiff is a Black man whose ancestors were enslaved.

74.    Fennema violated Plaintiff's immunity from the badges of slavery by imposing a badge of slavery upon him, the rehire analysis form, which contained the scarlet letters painting him as a violent brute who must not be be given access to the building because he will immediately attack others, including Fennema. This false statement was implied by Fennema despite Fennema, upon information and belief, only possessing only a public trust Background check. Plaintiff currently holds a Secret Clearance and has been found suitable for Federal Employment by the Department of Defense. Plaintiff was thus subjected to such remarks that made him feel dehumanized, an incident of slavery, and resulted in cat's paw retaliation by Fennema when he was not hired as a Patent Examiner despite being most qualified for the position.

75.     Fennema remarked on December 2, 2015, that Plaintiff's conduct was not unsatisfactory and the last physical contact Fennema had with Plaintiff was when Plaintiff was issued a Safety Zone warning. Despite Safety Zone warnings not being a disciplinary action, Fennema or someone else submitted the January 2016 Safety Zone warning on the Rehire Analysis Form to undermine Stewart's chances of being hired by Selecting Official Keisha Bryant.

## Count III
### (Non-Selection on the Basis of Disability, Rehabilitation Act)

76.     The previous paragraphs are copied as if set forth herein.

77.     The Agency applied its rehiring policy to Complainant in a manner that excluded him from employment, in violation of 29 C.F.R. 1630.10(a), which states in part;

> It is unlawful for a covered entity to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of disability, unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job related for the position in question and is consistent with business necessity.

78.     The Agency used the discriminatory Ban and Bar policy, which tends to screen out Black employees who are disabled, by arbitrarily stereotyping Patent Examiners actual disability symptoms such as shaking and breathing, which may occur during a panic attack, as an episode of workplace violence.

79.     These same Agency personnel, without first seeking approval for their wanton policy from Coy, 780 F.2d 1001 Commerce failed to perform a *Metz Analysis* prior to concluding an event. In *Metz v. Department of the Treasury* (Fed. Cir. 1986), the Federal Circuit Court stated that to determine if the words constituted a threat, the Merit Systems Protection Board must use

18

the connotation that a reasonable person would give the words. The Court listed several factors to consider in making a determination of a threat:

1. listener's reactions;

2. listener's apprehension of harm;

3. speaker's intent;

4. conditional nature of the statements; and

5. attendant circumstances.

28. The *Metz* analysis further requires that if a determination that an employee is a direct threat to himself or others, a finding has to be made as to whether this threat can be reduced or eliminated via the granting of a reasonable accommodation.

80. By placing Plaintiff on the Ban and Bar list without conducting a *Metz* analysis, Commerce allowed by malfeasance the USPTO to enact policies that perpetuate discrimination on the basis of disability.

81. This is due to the fact that The *Metz* analysis further requires that if a determination that an employee is a direct threat to himself or others, a finding has to be made as to whether this threat can be reduced or eliminated via the granting of a reasonable accommodation.

82. This same analysis should have been done by the Selecting Official Keyshia Bryant but was not since Commerce failed to direct all hiring officials at USPTO to take  policy classes or otherwise training in policy including a review of the Ban and Bar policy and the rehire analysis policy in order to bring them into compliance with all applicable laws or to eliminate them if impracticable.

83.    The same Ban and Bar list appears as a reason not to hire Plaintiff as a Patent Examiner for the Vacancy Announcement in question on the Rehire Analysis Sheet, further proliferating disability discrimination while dodging legal accountability, checks, and balances.

84.    The selection criteria, not being on the ban and bar list and/or not having a supervisor make a unsubstantiated remarks about your conduct, is too easy to proliferate discrimination in an arbitrary and capricious manner that that selection criteria, having been found easily manipulated to screen out disabled job applicants, based on current disparate impact statistics, must be eliminated.

## Count IV
### (Non-Selection on the Basis of Race (Black), Title VII)

85.    The previous paragraphs are copied as if set forth herein.

86.    The Agency applied its rehiring policy to Complainant in a manner that excluded him from employment, in violation of Title VII.

87.    The Agency used the discriminatory Ban and Bar policy, which tends to screen out Black employees, by arbitrarily stereotyping Patent Examiners who are Black as having committed an episode of workplace violence by attributing to them actions that they did not take, making false claims and crossing their fingers hoping every deciding official is on the same racist page.

88.    Gregory Royal, a former Patent Examiner, was informed he was placed on the Ban and Bar list because he hit an employee, but this employee does not exist in any record and was an allegation that was fabricated out of thin air by Anne Mendez.

89.    Fenyang Stewart was alleged to have told his supervisor he brought a security guard to prevent himself from attacking Lo, but later, in a 1-on-1 meeting with Lo, allegedly lunged at

his supervisor without touching him or the desk 4 inches away from his knees and stomped off down the hall. These actions were alleged to have occurred despite Plaintiff having two bulged discs in his back that prevented him from moving in such a manner at the time, and were allegations made by his supervisor Kenneth Lo that were fabricated out of thin air.

90.    These same Agency personnel, without first seeking approval for their wanton policy from Coy, 780 F.2d 1001 Commerce failed to perform a *Metz Analysis* prior to concluding an event. In *Metz v. Department of the Treasury* (Fed. Cir. 1986), the Federal Circuit Court stated that to determine if the words constituted a threat, the Merit Systems Protection Board must use the connotation that a reasonable person would give the words. The Court listed several factors to consider in making a determination of a threat:

1. listener's reactions;

2. listener's apprehension of harm;

3. speaker's intent;

4. conditional nature of the statements; and

5. attendant circumstances.

28. The *Metz* analysis further requires that if a determination that an employee is a direct threat to himself or others, a finding has to be made as to whether this threat can be reduced or eliminated via the granting of a reasonable accommodation.

91.    By placing Plaintiff on the Ban and Bar list without conducting a *Metz* analysis, Commerce allowed by malfeasance the USPTO to enact policies that perpetuate discrimination on the basis of race.

92.    This is due to the fact that The *Metz* analysis further requires that if a determination that an employee is a direct threat to himself or others, a finding has to be made as to whether this threat can be reduced or eliminated via the granting of a reasonable accommodation.

93.    This same analysis should have been done by the Selecting Official Keyshia Bryant but was not since Commerce failed to direct all hiring officials at USPTO to take  policy classes or otherwise training in policy including a review of the Ban and Bar policy and the rehire analysis policy in order to bring them into compliance with all applicable laws or to eliminate them if impracticable.

94.    The same Ban and Bar list appears as a reason not to hire Plaintiff as a Patent Examiner for the Vacancy Announcement in question on the Rehire Analysis Sheet, further proliferating racial discrimination while dodging legal accountability, checks, and balances.

95.    The selection criteria, not being on the ban and bar list and/or not having a supervisor make a unsubstantiated remarks about your conduct, is too easy to proliferate discrimination in an arbitrary and capricious manner that that selection criteria, having been found easily manipulated to screen out Black job applicants, based on current disparate impact statistics, must be eliminated.

**Count IV**

**(Non-Selection on the Basis of Retaliation for Prior EEO activity, *Stewart v. Lee* Title VII)**

96.    On or around July 2015, Plaintiff engaged in protected EEO activity when he filed a formal EEO Complaint USPTO No. 15-56-46 that became the basis for *Stewart v. Iancu*, 912 F.3d 693 (2019) which Plaintiff initiated *Pro Se* and resulted in a published decision on the merits in his favor.

97.    Robert Fennema and Kenneth Lo were named as Responsible Management Officials in the prior underlying EEO complaints.

98.    When Plaintiff applied for a Patent Examiner GS-9 position on or around January 2021, his former supervisor Robert Fennema raised outdated allegations of workplace violence that were already found UNSUSTAINED on appeal as reasons for Plaintiff not to be rehired as communicated on the Rehire Analysis form, which was the direct and proximate cause for Plaintiff not being rehired.

99.    The causal connection between the protected activity and the adverse action, the non-selection, was the actual comments made by Fennema on the Rehire Analysis form, which point to the same allegations made almost 7 years ago and doubling down on them with a new batch of fresh fear despite being found to be false or unworthy of credence on appeal.

100.    As a result of all Causes of Action as listed herein, Plaintiff suffered damages including but not limited to loss of hair, loss of income, emotional pain and suffering, mental anguish, and loss of consortium, humiliation, dehumanization, emotional distress, high blood pressure, sleep apnea, weight gain, and otherwise exacerbation of Plaintiff's disabilities..

## Prayer for Relief

Wherefore, Plaintiff, Fenyang Stewart prayers that all the relief stated throughout and in the relief section of his amended complaint be granted, and

A.  Compensatory damages, non-pecuniary and pecuniary

B.  Instatement into the Patent Examiner position he would have started absent the discrimination

C.  Backpay, including prejudgment interest and compensating him for all lost benefits , including any benefits related to seniority, pay step increases, tuition reimbursement, and otherwise make him whole;

D. Front pay, adjusted for inflation;

E. Compensatory damages and Punitive damages against Robert Fennema in his individual capacity,

F. Corrected annual leave and all benefits;

G. A posting order of a finding of discrimination online for 1 year and at Agency's physical offices;

H. Order the Agency to pay the plaintiff his costs, expert witness fees and reasonable attorney's fees incurred in pursuing the matter herein, if applicable;

I. Award plaintiff such other relief, legal or equitable, as may be warranted;

J. Training for all Responsible Management Officials in Title VII, Rehabilitation Act, Racial Discrimination, Reprisal, Retaliation, and the Thirteenth Amendment;

K. Agency reporting on disciplinary actions related to findings of discrimination, including retaliation by the Agency via an online posting (within 90 days of such finding) and via a written report to the EEOC (within 120 days of such finding), and to Congress.

Plaintiff demands a trial by jury on all of his claims.

Executed on this 19th day of January, 2023.

Respectfully Submitted,

/S/

Fenyang Stewart,
Plaintiff, *Pro Se*
PO Box 4221
Alexandria, VA, 22303-9998
fstewart2@gmail.com
757.506.4579

24

**CERTIFICATION**

**I HEREBY CERTIFY** that on this January 19, 2023,  and declare under penalty of

perjury under the laws of the United States of America that:

    1. The matters sworn herein are made from my personal knowledge and are true and correct to the best of my information, knowledge and belief, and that I am competent to testify thereto.

    2. No attorney has prepared, or assisted in the preparation of this document..

    3. This Complaint was filed with the Clerk for the District Court for the District of Columbia.

    4. Copies of the Complaint were stamped to be given to process servers to serve the Defendants.

    Fenyang Stewart    Name of Pro Se Party

    /s/ Fenyang Stewart Signature of Pro Se Party

Executed on:    01/19/23